[L.A. No. 31202. Aug. 7, 1980.]

ARLENE CARSTEN, Plaintiff and Appellant, v.
PSYCHOLOGY EXAMINING COMMITTEE OF THE BOARD
OF MEDICAL QUALITY ASSURANCE,
Defendant and Respondent.

COUNSEL

William M. McCarty, McCarty & Quackenbush and Douglas C. Brown for Plaintiff and Appellant.

George Deukmejian, Attorney General, and Alvin J. Korobkin, Deputy Attorney General, for Defendant and Respondent.

OPINION

MOSK, J.—May a member of an administrative agency employ judicial processes to challenge the legality of action taken by the very board on which he or she serves as a member? In probing this unique issue we plow untilled ground: our attention has not been directed to authority in any jurisdiction directly on point.[1]

Appellant Arlene Carsten (hereinafter petitioner) filed a petition for writ of mandate in the superior court to compel the Psychology Examining Committee of the Board of Medical Quality Assurance of the State of California to comply with Business and Professions Code section 2942. The trial court sustained a demurrer without leave to amend and entered a judgment of dismissal. We affirm.

On this appeal we accept as true the allegations of the petition. (*Isrin* v. *Superior Court* (1965) 63 Cal.2d 153, 155 [45 Cal.Rptr. 320, 403 P.2d 728].) On May 11, 1976, Carsten was appointed by the Governor as a member of the Psychology Examining Committee of the Board of Medical Quality Assurance (PEC), which has the statutory obligation to insure that only qualified individuals practice psychology in California. Business and Professions Code section 2942 (all references herein are to that code unless otherwise cited) provides: "The committee may examine by written or oral examination or by both. The examination shall be given at least twice a year at the time and place and under such

---

[1]We have examined the works of the following authorities and they discuss no case on point: Davis, Administrative Law Treatise (1958 and 1970 supp.); Rabin, Perspectives on the Administrative Process (1979); Schwartz, Administrative Law (1976); Jaffe and Nathanson, Administrative Law (1968); Woll, Administrative Law (1963); Forkosch, A Treatise on Administrative Law (1956); Parker, Administrative Law (1952); McFarland and Vanderbilt, Cases on Administrative Law (1947); Hart, An Introduction to Administrative Law (1940); Gellhorn, Administrative Law (1940); Landis, The Administrative Process (1938).

supervision as the committee may determine. A grade of 75 percent shall be a passing grade."

Prior to the April 1977 examination, in screening applicants PEC used a written examination prepared by its members in combination with an oral examination. Beginning with the April 1977 examination, and over petitioner's dissenting vote, PEC substituted an objective national examination for the written portion of its test. In administering the new test PEC adopted a national mean for its passing score rather than 75 percent of the raw score as required by section 2942. Because the national mean included some candidates who were statutorily disqualified from taking the California examination, the net effect was to lower the requirements for licensure by reducing the passing grade for the examination, resulting in passage of the examination by some applicants with grades as low as 67.5 percent of the raw score.

PEC's demurrer was sustained and the petition dismissed primarily on the ground that Carsten lacked standing to sue because she was not a "beneficially interested" party as required by Code of Civil Procedure section 1086. If the petition reveals that Carsten lacks either the right or standing to sue, it is vulnerable to a general demurrer on the ground that it fails to state a cause of action. (*Parker* v. *Bowron* (1953) 40 Cal.2d 344, 351 [254 P.2d 6]; *Klopstock* v. *Superior Court* (1941) 17 Cal.2d 13, 19 [108 P.2d 906, 135 A.L.R. 318]; *Oakland Municipal Improvement League* v. *City of Oakland* (1972) 23 Cal.App.3d 165, 170 [100 Cal.Rptr. 29]; *Hart* v. *County of Los Angeles* (1968) 260 Cal. App.2d 512, 516 [67 Cal.Rptr. 242]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 814.)

■ Section 1086 expresses the controlling statutory requirements for standing for mandate: "The writ must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law. It must be issued upon the verified petition of the party beneficially interested." The requirement that a petitioner be "beneficially interested" has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large. (*Parker* v. *Bowron, supra*, 40 Cal.2d 344, 351; *Fritts* v. *Charles* (1904) 145 Cal. 512, 513 [78 P. 1057]; *Fuller* v. *San Bernardino Valley Mun. Wat. Dist.* (1966) 242 Cal.App.2d 52, 56 [51 Cal.Rptr. 130]; Cal. Civil Writs (Cont.Ed. Bar 1970) p. 75.) As Professor Davis states the rule: "One who is in

fact adversely affected by governmental action should have standing to challenge that action if it is judicially reviewable." (Davis, 3 Administrative Law Treatise (1958) p. 291.)

■ It is clear that since petitioner is neither seeking a psychology license, nor in danger of losing any license she possesses under the rule adopted by the board, she is not a beneficially interested person within the meaning of the statute. Our view under state law is consistent with federal law and a long line of decisions of the United States Supreme Court. (See, e.g., *Warth v. Seldin* (1975) 422 U.S. 490 [45 L.Ed.2d 343, 95 S.Ct. 2197]; *Simon v. Eastern Ky. Welfare Rights Org.* (1976) 426 U.S. 26 [48 L.Ed.2d 450, 96 S.Ct. 1917]; *United States v. Richardson* (1974) 418 U.S. 166 [41 L.Ed.2d 678, 94 S.Ct. 2940]; *Schlesinger v. Reservists to Stop the War* (1974) 418 U.S. 208 [41 L.Ed.2d 706, 94 S.Ct. 2925]; *Ex parte Levitt* (1937) 302 U.S. 633 [82 L.Ed. 493, 58 S.Ct. 1]; *Massachusetts v. Mellon* (1923) 262 U.S. 447, 488 [67 L.Ed. 1078, 1085, 43 S.Ct. 597].)

But, urges petitioner, there are exceptions to the foregoing rule for property owners, taxpayers and voters, and she qualifies under the exceptions. We agree there are circumstances under which a citizen-taxpayer may compel a governmental instrumentality to comply with its constitutional or statutory duty. (See, e.g., *Hollman v. Warren* (1948) 32 Cal.2d 351, 357 [196 P.2d 562]; but also see *Atlanta v. Ickes* (1939) 308 U.S. 517 [84 L.Ed. 440, 60 S.Ct. 170]; Davis, *op. cit. supra*, p. 266.) However, the cases relied upon by petitioner are not apposite; and in any event she possesses none of the virtues discussed therein, and has noteworthy detriments, for entitlement to exemption from the requirements of section 1086.

In *Bd. of Soc. Welfare v. County of L. A.* (1945) 27 Cal.2d 98 [162 P.2d 627], the county had cancelled welfare checks; the social welfare board, acting as *parens patriae*, brought an action on behalf of three needy recipients who would otherwise be dependent upon public relief. Though there was incidental dictum about citizen interest in enforcing a duty, unquestionably the Board of Social Welfare was beneficially interested in the result within the meaning of section 1086. Indeed, this court so held. (*Id.* at p. 100.) The present petitioner has no comparable interest.

Similarly in *Hollman v. Warren, supra*, 32 Cal.2d 351, the plaintiff was herself an applicant for a notary commission, and thus had a mani-

fest beneficial interest in mandating the Governor to issue such commissions. This petitioner is not seeking a psychology license and, again, has no comparable interest. In *Fuller* v. *San Bernardino Valley Mun. Wat. Dist., supra,* 242 Cal.App.2d 52, the court specifically found the petitioner therein had a special interest independent of that maintained by the public. *American Friends Service Committee* v. *Procunier* (1973) 33 Cal.App.3d 252 [109 Cal.Rptr. 22], involved groups active in prison reform seeking invalidation of certain rules enacted under the Administrative Procedure Act; the court merely held the rules are not applicable to prisons.

Nothing in the foregoing decisions justifies reliance thereon by petitioner. On the other side of the coin are persuasive legal and policy reasons why an exception to the statutory requirement of beneficial interest should not be carved out for a person in this posture.

As a broad proposition, state taxpayers have standing to challenge the legality of the expenditure of public funds by any governmental agency (Davis, *op. cit. supra,* p. 245) and, unlike federal courts, most states permit such citizen-taxpayer suits even on nonfiscal issues (*id.* at p. 249). The issue here, then, is whether an administrative board member is, for purposes of this litigation, a mere taxpayer.

First of all, the law is clear that courts are reluctant to give advisory opinions. (*People* ex rel. *Lynch* v. *Superior Court* (1970) 1 Cal.3d 910, 912 [83 Cal.Rptr. 670, 464 P.2d 126].) Since petitioner has no personal interest in the outcome of the litigation, she is in effect seeking to have the courts render an advisory opinion on the propriety of an administrative action. A judgment here would affect no person either favorably or detrimentally; it would purely and simply offer gratuitous advice to the board on how to conduct its examinations in the future as they may possibly affect some applicant other than this petitioner.

Second, petitioner is in effect suing herself. She is the moving party in this litigation; the named defendant is the Psychology Examining Committee of the Board of Medical Quality Assurance, of which petitioner is part as a duly appointed member. It is unique to say the least, for one to sue herself and be both plaintiff and defendant in the same litigation. It may be said that she cannot lose the lawsuit, but we doubt that courts should encourage or permit this type of narcissistic litigation. We reach this conclusion because of the inevitable damage such lawsuits will inflict upon the administrative process.

That brings us to the policy issues which militate against permitting disgruntled governmental agency members to seek extraordinary writs from the courts. Unquestionably the ready availability of court litigation will be disruptive to the administrative process and antithetical to its underlying purpose of providing expeditious disposition of problems in a specialized field without recourse to the judiciary. Board members will be compelled to testify against each other, to attack members with conflicting views and justify their own positions taken in administrative hearings, and to reveal internal discussions and deliberations. Litigation—even the threat of litigation—is certain to affect the working relationship among board members. In addition, the defense of lawsuits brought by dissident board members—and such suits would undoubtedly be frequent—will severely tax the limited budgetary resources of most public agencies.

From the vantage point of the judiciary such litigation has ominous aspects. It is purely and simply duplicative, a rerun of the administrative proceedings in a second, more formal forum. The dissident board member, having failed to persuade her four colleagues to her viewpoint, now has to persuade merely one judge. The number of such suits emanating from members on city, county, special district and state boards, will add significantly to court calendar congestion.

While it is true that this petitioner is not only a board member but also a taxpayer, it is as a board member that she acquired her knowledge of the events upon which she bases the lawsuit. Her interest in the subject matter was piqued by service on the board, not by virtue of the neutrality of citizenship. The suit was brought in the former, not the latter capacity.

The law is replete with examples of forfeiture of some rights available to others by virtue of acceptance of public service. The classic illustration is *McAuliffe* v. *Mayor, etc., of City of New Bedford* (1892) 155 Mass. 216 [29 N.E. 517], in which a policeman sought reinstatement to his position after discharge for exercising his right to engage in political activity. Justice Holmes, with his trenchant pen, wrote: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. There are few employments for hire in which the servant does not agree to suspend his constitutional rights of free speech as well as of idleness by the implied terms of his contract." (*Id.* at pp. 517-518.)

A similar rule has long prevailed in California. In *Christal v. Police Commission* (1939) 33 Cal.App.2d 564, 569 [92 P.2d 416], the court declared "There is nothing startling in the conception that a public servant's right to retain his office or employment should depend upon his willingness to forego his constitutional rights and privileges to the extent that the exercise of such rights and privileges may be inconsistent with the performance of the duties of his office or employment." It follows that petitioner may not exercise her citizen's right to sue an administrative board and to simultaneously serve on the same board. The two functions are manifestly incompatible; one or the other must yield.

The Second Circuit court was in accord in *Holtzman v. Schlesinger* (2d Cir. 1973) 484 F.2d 1307. Congressman Holtzman, having failed to persuade her congressional colleagues that the United States bombing of Cambodia was illegal, brought a court action as a citizen-taxpayer. Like the instant petitioner, Holtzman did not allege a mere policy disagreement but illegality of action by a government department. The court held she lacked standing, that she had her opportunity to present her views in the proper forum, the Congress, and "The fact that her vote was ineffective was due to the contrary votes of her colleagues. . . ." (*Id.* at p. 1315.) Holtzman had a better case than this petitioner; she did not sue the Congress, in which her views had been rejected—as petitioner sues the board in which she was defeated—but she proceeded against the Defense Department which was administering the alleged illegal activity. Nevertheless her suit was dismissed on the standing issue.

Professor Davis mused on whether the counsel for a board may bring a lawsuit: "Although it is not clear whether, as a theoretical matter, the General Counsel [of the NLRB] would have standing to challenge his own Board's orders, it is abundantly clear that such standing, if extended and invoked, would produce nothing but embarassment and paralysis to the administrative process." (Davis, *Standing of a Public Official to Challenge Agency Decisions: A Unique Problem of Administrative Law* (1964) 16 Admin.L.Rev. 163, 169-170.) Obviously he could not even contemplate a board *member* judicially challenging her own board.

Petitioner suggests, finally, that even if she lacks standing to sue, others may be induced to do so on her behalf. That, of course, is a possibility, but it is a slender reed on which she can lean. We cannot

speculate on the motivation of someone else who might, in the future, file a lawsuit; all we can examine in this proceeding is the right of this individual petitioner to do so. We conclude that a board member is not a citizen-taxpayer for the purpose of having standing to sue the very board on which she sits.

The history of modern administrative law has been that of expansion, with correlative restraint by the judiciary. As the United States Supreme Court has said on more than one occasion: "We certainly have neither technical competence nor legal authority to pronounce upon the wisdom of the course taken by the Commission." (*Board of Trade* v. *United States* (1942) 314 U.S. 534, 548 [86 L.Ed. 432, 433, 62 S.Ct. 366]; also see *Udall* v. *Tallman* (1965) 380 U.S. 1, 16 [13 L.Ed.2d 616, 625, 85 S.Ct. 792].) With such uncharacteristic expressions of modesty, courts for the first half of this century yielded to administrative expertise. But, as Professor Schwartz observed in his treatise on Administrative Law (1976) at page 22, "Administrative law is now at a turning point in its history. . . . We now seem to be moving toward a new period whose essential outlines are not yet clear." The trend, not altogether salutary, is for the courts to exercise "an increasingly activist role. . .the courts have come to assume a virtual ombudsman function." (*Id.* at p. 29.) We believe, however, that the California judiciary is ill-equipped to add to its already heavy burden the duty of serving as an ombudsman for the plethora of state administrative agencies and local agencies that exist in every one of our 58 counties.[2] Yet that role will inevitably be imposed if minority board members may bring their defeats and frustrations to courts for a second chance at persuasion.

Providing her own example of this danger, petitioner filed three lawsuits against PEC in the San Diego Superior Court, the most recent case challenging the validity and regularity of oral examinations, charging the examinations were not given in a uniform manner and that all applicants were not questioned in all required areas of learning. The handwriting is on the wall: if petitioner were to prevail courts will be asked constantly to resolve internal board conflicts over licensing examination procedures. And if that were permitted, the utility of admini-

---

[2]As Chief Justice Burger lamented in *United States* v. *Richardson* (1974) 418 U.S. 166, 179 [41 L.Ed.2d 678, 689-690, 94 S.Ct. 2940]: "As our society has become more complex, our numbers more vast, our lives more varied, and our resources more strained, citizens increasingly request the intervention of the courts on a greater variety of issues than at any period of our national development."

strative boards—unless they always achieve unanimity—would face an untimely demise.

We choose to avoid taking, as requested, a giant step toward immobilizing administrative process in California and in time rendering it impotent and chaotic. Whether it is wise to transfer to the courts all administrative matters that lack unanimity is a policy issue to be debated in legislative halls. We deem it improper to achieve such result through this misguided petition.

The judgment is affirmed.

Clark, J., Manuel, J., and Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent. In my view, a public member of a government agency has standing to challenge by petition for writ of mandate that agency action which fails to comport with its obligatory duties. There is no provision of law, constitutional, statutory, or decisional, which shuts the courthouse doors to such a person. The issue therefore becomes one of policy and, while arguable, I am unpersuaded by the majority that a citizen's important right of access to the courts should thus be denied.

The general rule on standing for mandamus relief, as described in Code of Civil Procedure sections 1085 and 1086, limits standing to those "beneficially interested."

The foregoing general principle, however, has been considerably extended by numerous court decisions which have subsequently recognized as "beneficially interested" a cluster of property owners, taxpayers, and voters in those cases in which the purpose of the proceedings is enforcement of a *clear public duty* and the public interest would suffer from a failure to perform such duty. (*Hollman v. Warren* (1948) 32 Cal.2d 351, 357 [196 P.2d 562]; *Bd. of Soc. Welfare v. County of L. A.* (1945) 27 Cal.2d 98, 100-101 [162 P.2d 627]; *Coldwell v. Board of Public Works* (1921) 187 Cal. 510, 520 [202 P. 879]; *McDonald v. Stockton Met. Transit Dist.* (1973) 36 Cal.App.3d 436, 440 [111 Cal. Rptr. 637]; *American Friends Service Committee v. Procunier* (1973) 33 Cal.App.3d 252, 256 [109 Cal.Rptr. 22]; *Knoff v. City etc. of San Francisco* (1969) 1 Cal.App.3d 184, 198 [81 Cal.Rptr. 683]; *Fuller v. San Bernardino Valley Mun. Wat. Dist.* (1962) 242 Cal.App.2d 52, 57

[51 Cal.Rptr. 120]; *Kappadahl* v. *Alcan Pacific Co.* (1963) 222 Cal. App.2d 626, 643 [35 Cal.Rptr. 354].)

Several of these cases both disclose the rationale and define the ambit of these judicial extensions. In *Bd. of Soc. Welfare* v. *County of L. A., supra,* 27 Cal.2d 98, Los Angeles County had cancelled certain welfare checks six months after their issue date pursuant to provisions of the Welfare and Institutions Code. The state Board of Social Welfare sought mandate on behalf of three needy welfare recipients to compel the issuance of duplicate checks. We held that the board had standing to seek such a writ, observing, "The rule is stated thus in 35 American Jurisprudence 73, section 320: '[B]y the preponderance of authority . . . where the question is *one of public right* and the object of the mandamus is to procure the *enforcement of a public duty*, the relator need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced . . . . [P. 76, § 322.] *Generally, when a power or duty is imposed by law upon a public board or officer, and in order to execute such power or perform such duty, it becomes necessary to obtain a writ of mandamus, it or he may apply for the same.'"* (*Bd. of Soc. Welfare* v. *County of L. A., supra,* at pp. 100-101, italics added.)

Similarly, in *Hollman* v. *Warren, supra,* 32 Cal.2d 351, an applicant for a notary commission sought a writ of mandate to compel the Governor to exercise his discretion regarding the appointment of notaries public for San Francisco. Apart from the fact that she was personally interested as an applicant, we held that, as a resident and taxpayer of San Francisco, the applicant had an interest in having a sufficient number of notaries commissioned therein. The law imposed a mandatory duty on the Governor to act on the appointment of notaries public. We noted that "[a]side from her character as an applicant for appointment as a notary it is alleged that she is a resident and taxpayer of the city and county of San Francisco. *As such* she is interested in having a sufficient number of notaries commissioned to act therein." (Pp. 356-357, italics added.)

In *Fuller* v. *San Bernardino Valley Mun. Wat. Dist., supra,* 242 Cal.App.2d 52, petitioners obtained a peremptory writ of mandate ordering a municipal water district to terminate its proceedings for the annexation of lands underlying Big Bear Lake. The water district contended that petitioners lacked any beneficial interest. The *Fuller* court

acknowledged that an exception to the general rule requiring the existence of a substantial right "is recognized where the question is one of public right and the object of the writ is to procure performance of a public duty." (P. 57.)

In *American Friends Service Committee v. Procunier, supra*, 33 Cal.App.3d 252, several nonprofit corporations active in the area of prison reform brought suit to require the Department of Corrections and the Adult Authority to comply with the Administrative Procedure Act in the formulation of their rules and regulations. The Court of Appeal, in discussing plaintiffs' standing to sue, stressed that the petition was one "for mandate alleging that a government department is not complying with the law and seeking a court order compelling such compliance." (P. 256.) Relying on *Bd. of Soc. Welfare*, the *Friends* court in recognizing plaintiffs' standing said: "Petitioner in a mandamus proceeding must demonstrate that the writ is necessary to enforce or protect a specific legal right that is clear, present, certain and substantial. (*Parker v. Bowron* (1953) 40 Cal.2d 344...; *Monarch Cablevision, Inc. v. City Council* (1966) 239 Cal.App.2d 206...; 5 Witkin, Cal. Procedure (2d ed. 1971) p. 3841.) Where, however, the question is one of public, as opposed to private, interest, and petitioner seeks performance of a public duty, it is said the foregoing requirements of petitioner's rights and respondent's duty have been 'relaxed.' (5 Witkin, *supra*, p. 3847; Cal. Civil Writs (Cont.Ed.Bar 1970) p. 73; *Fuller v. San Bernardino Valley Mun. Wat. Dist.* (1966) 242 Cal.App. 2d 52...)." (*Ibid.*)

Petitioner is a citizen and taxpayer, presumably endowed with all of the constitutional and procedural rights of every other citizen. She alleges that the committee is violating a statutory command contained in Business and Professions Code section 2942, namely, in connection with applicants' examination "a grade of 75 percent shall be a passing grade." The mandate is clear. It may be wise or unwise but it is explicit. The case is one which involves a public interest. The careful licensure of psychologists directly affects the quality of that aspect of medical practice in California. Were petitioner not a member of the Psychology Examining Committee (PEC) there would be no question concerning her right, as a member of the general public, to seek mandate relief. In my view, there is no logical distinction which would embrace the foregoing cases and yet bar the plaintiff.

Nor, contrary to the majority, do I find anything "advisory" in the relief which petitioner seeks. She asks for an affirmative mandate from this court directing PEC to comply with its statutory obligation. If the prayer of her petition is granted, no one is "advised" of anything, not PEC, nor petitioner. That is not the petition's mission. "The common law prerogative writ of mandamus has developed into a remedy to compel performance of a ministerial duty. . . ." (Cal. Civil Writs (Cont.Ed. Bar 1970) § 2.5, p. 9.) That is the purpose of the petition for mandate before us. Authority to issue the relief is constitutionally conferred (Cal. Const., art. VI, § 10) upon us and our issuance of the writ is so common as to require no further explanation.

In similar fashion, and with due deference, I suggest that the majority's contention that petitioner is "suing herself" withers under closer inspection. The defendant is a committee, statutorily created (§ 2920), as a constituent element of the Board of Medical Examiners of the Department of Consumer Affairs. Petitioner is a *member* of the committee appointed by the Governor and serving a four-year term. It is self-evident that she is not the agency, but is only one of the members thereof, and that only temporarily. Her target is the agency, the legal entity, not its members.

The majority must rely on policy considerations alone. Why should courts strip "citizen-taxpayer" status from an entire section of the public composed of persons who also happen to be public members of a government agency? The majority's reasons are insufficient.

In my opinion the majority substantially exaggerates the judicial "burdens" that would be imposed were we to permit access to the courts to petitioner, and others similarly situated. The majority, fearing an explosion of lawsuits, conjures a litigation disaster that would engulf us were petitioner's rights as a citizen to be honored. It is overreaction to anticipate that the entire administrative process will thus be transported, wholesale, to the courts. I predict that the dreaded, and overused, Pandora's box would prove to be comparatively empty. Taxpayers and aggrieved persons generally have been permitted for years to bring suits challenging certain government actions. While I have no statistics either way, I doubt that the volume of such types of actions has become unmanageable. Nor is there any proof that such proceedings have become notoriously triggered by bad faith. Trial courts have shown themselves fully capable of weeding out those disputes which are not the proper subjects of judicial intervention.

Moreover, this proceeding and the other illustrative cases previously described can readily be distinguished from *Holtzman* v. *Schlesinger* (2d Cir. 1973) 484 F.2d 1307, on which the majority principally relies. In *Holtzman*, a United States Congresswoman sought declaratory and injunctive relief against the Secretary of Defense in an attempt to bring to a halt military activities in Cambodia during the Vietnam War. The *Holtzman* court found that the legality of the fighting posed a "political" question and accordingly was nonjusticiable. There is an obvious distinction between litigating the legality of a war and litigating the propriety of administrative action on the ground that the action deviates from legislatively mandated licensing procedures. The former invades the constitutionally endowed power of an equal and coordinate branch of government. The latter addresses compliance with one of the myriad of statutory requirements of one of our state agencies.

The issue herein presented is not "political." Rather, it concerns the enforced compliance with a professional grading standard which the Legislature has clearly, and with full authority, explicitly fixed. No deference is due another branch. The only issue is whether the challenged grading procedure of PEC complies with the legislative mandate of section 2942. Petitioner seeks only to enforce the statute.

The efficacy of limiting standing of agency members in order to avoid *administrative* complications is equally doubtful, as shown by a mere consideration of the available alternatives. If petitioner herself is denied standing, she could readily have a friend or family member as a representative citizen indirectly bring the action on her behalf. If challenged, our courts would then have to resolve the question of who is the "real" party behind the suit. In such case, the identical "intra-mural" agency conflict which the majority fears would arise as would the same potential "threat" of an internecine quarrel. In the alternative, petitioner could resign her government position and then seek mandate. In either case, I see no net administrative gain in stripping from petitioner her status as a citizen taxpayer thereby denying to her the precise relief which we might well have to give her proxy or, alternatively, forcing her to resign from public service. We would thus be honoring the shadow while rejecting the substance.

A firmly established series of cases has held that petitioner's standing to pursue her remedy is based on a generally recognized right and not on any exception that need be drawn in her case. A holding by this

court to the contrary should only be compelled by strong countervailing legal or policy arguments. None appears.

The right of access to our law courts is a very important attribute of citizenship. Petitioner is a citizen and taxpayer as well as an agency board member. She, and others like her, may be particularly well informed and uniquely suited to assure that public agencies conform their procedures to statutory duty. Petitioner as an interested citizen devotes substantial amounts of time and energy toward the stated objectives of the committee. The public interest is not advanced when her willingness to serve is penalized by forfeiture of one of her important civil rights.

I would reverse the judgment of dismissal.

Bird, C. J., and Tobriner, J., concurred.

Appellant's petition for a rehearing was denied October 3, 1980. Bird, C. J., Tobriner, J., and Richardson, J., were of the opinion that the petition should be granted.