[Civ. No. 21827. Fourth Dist., Div. Two. Jan. 9, 1981.]

BETTY SUE STOCKS et al., Plaintiffs and Appellants, v. CITY OF IRVINE, Defendant and Respondent.

**COUNSEL**

John E. McDermott, Diane Messer, Jonathan Lehrer-Graiwer, Richard A. Rothschild, Crystal C. Sims and Robert M. Myers for Plaintiffs and Appellants.

Carolyn Burton, Harry M. Snyder, Luana Martilla and Carl K. Oshiro as Amici Curiae on behalf of Plaintiffs and Appellants.

Rutan & Tucker, Leonard A. Hampel and Jeffrey M. Oderman for Defendant and Respondent.

**OPINION**

**MORRIS, J.**—Plaintiffs appeal from an adverse judgment following the granting of defendant's motion for summary judgment. Plaintiffs are seeking declaratory and injunctive relief against the City of Irvine because Irvine's land use ordinances and regulations allegedly violate the Constitutions and laws of the United States and California by excluding from Irvine housing for low and moderate income people. Summary judgment was granted after the trial court held that plaintiffs did not have standing to sue.

## *The Facts*

The complaint alleges that because of its substantial industrial development, the City of Irvine has become one of the major employment centers in southern California; that this development has led to the creation of thousands of jobs that are being filled or could be filled by persons of low and moderate income; and that this has created an enormous need for moderate and low-cost housing within the city which has been exacerbated by the existing critical shortage of such housing throughout southern California.

The complaint further alleges that Irvine has not only failed to provide for its fair share of moderate and low-cost housing, but has systematically prevented low and moderate income persons from living in Irvine through the following zoning and land use regulations:

(1) the imposition of unreasonably strict design and amenity requirements that are unrelated to insuring minimum health and safety standards;

(2) the zoning of an excessive amount of land for agricultural purposes and for low density, single family housing;

(3) the imposition upon developers of exactions and dedication requirements for such amenities as parks, open space, bike paths, equestrian paths and more transit rights-of-way beyond those needed to preserve health, safety and environmental quality;

(4) the requirement that capital improvements benefiting the entire city be financed either by developers or by homeowner associations, rather than by the city;

(5) the limitation on the number of multiple-unit dwellings built so that most of the multiple-unit housing permitted has been for single persons, such as on the University of California at Irvine campus or housing restricted to adults only;

(6) the severe limitation on the construction of mobile home facilities; and

(7) the regulatory scheme which requires administrative review of residential developments at several stages in the development process

and reserves to the city unrestricted discretion at each stage to determine and approve the nature of all developments, thereby delaying development, increasing its cost, and leading to lower densities and stricter design standards than originally contemplated.

It is alleged that the effect of all of these practices has been to drive up the cost of housing in Irvine well beyond the means of low and moderate income people. The plaintiffs are alleged to be low income people who live in substandard housing outside Irvine because they are unable to afford housing in the city.

Finally, it is alleged, the city's exclusionary practices and its failure to provide its fair share of low and moderate cost housing exceed its police powers, deny plaintiffs equal protection of the law, constitute racial discrimination, deprive plaintiffs of their due process rights and abridge their constitutional right to travel.

Irvine denied generally all of the plaintiffs' allegations and raised 48 affirmative defenses. Later, while extensive discovery was continuing, Irvine moved for summary judgment. The motion was based solely on the city's eighth affirmative defense: that the "[p]laintiffs have no personal interest in the matters alleged in the complaint sufficient to establish their standing to maintain this action."

Plaintiffs' principal claim of standing is based on their positions as low income citizens of Los Angeles and Orange Counties who would like to live in Irvine if they could find affordable housing there.[1] They con-

---

[1]The profiles of the plaintiffs are derived from the pleadings and the summary judgment declarations. The factual circumstances and status of the plaintiffs are not in dispute.

Betty Sue Stocks began her present employment as a clerk-typist for an Irvine corporation in January 1978. At that time she attempted unsuccessfully to locate housing in Irvine which she could afford. Her attempts included two months of reading newspaper ads and consulting with a rental information service. She rented an apartment in Huntington Beach, but has since moved several times and shared housing with other families in order to reduce costs. At the time of the summary judgment proceedings, she and her two children were staying temporarily with friends in Santa Ana. She states that, "[as] a working mother, [she] would prefer to live in Irvine close to [her] job so that [she] can spend more time with [her] children."

Dorothy McAleavey lives in a housing project in Long Beach, which she claims has been condemned by the city as substandard. She considers her housing project "to be an unsafe and unhealthy place in which to raise [her] children, but [she] cannot...

tend that Irvine's illegal zoning practices have injured them in two ways: by preventing them, because of their low income status, from obtaining housing in Irvine and by reducing the amount of low and moderate income housing in Irvine, which has adversely affected the housing market for the entire region, thereby increasing the housing costs where plaintiffs presently live. In short, the complaint alleges, "[i]f the CITY eliminated its exclusionary practices . . . and complied with its duty to provide its fair share of regional housing needs, plaintiffs would be able either to live in the CITY, or to afford better housing outside of the CITY . . . ."[2]

In its motion for summary judgment, Irvine contended that the plaintiffs' allegations were insufficient to confer standing because of the failure to specify a particular proposed housing project that would have been built but for the city's zoning practices. Irvine argued that because of this deficiency, plaintiffs lacked standing to bring suit. The trial court agreed with Irvine and granted the city's motion for summary judgment, applying the standing requirements of *Warth* v. *Seldin* (1975) 422 U.S. 490 [45 L.Ed.2d 343, 95 S.Ct. 2197].

On appeal, plaintiffs contend that *Warth* is not binding on this court, and that, under California's more liberal standard, they have established standing to sue in this case. Alternatively, they contend that they have standing even under *Warth*, if the standard is properly applied.

---

afford housing in another area." She would like to live in Irvine if there were affordable housing in that city.

John and Janice Shernaman currently live in Buena Park. For an eight-month period in 1976 and 1977, Mr. Shernaman was employed in Irvine. During four months of that time, they and their children "were forced to sleep in [their] car because [they] could not locate housing in Irvine or other nearby cities." They eventually rented an apartment in Westminster. They would both like to live in Irvine if there were affordable housing available.

Sharion Garrison lives with her two children in the city of Cypress. When she graduates from college, she plans to seek employment in a business management position. She states that "[i]t is very likely that [she] will look for housing in the City of Irvine because of the employment opportunities there," and that she would like to live in Irvine if there were affordable housing.

Betty Sue Webb lives in Culver City in a housing project that "is a very unsafe and dangerous place to live." If she could afford to, she would like to live in more desirable housing within Irvine.

[2]One of the plaintiffs, Betty Sue Stocks, additionally asserts standing to sue as a taxpayer under Code of Civil Procedure section 526a. Such standing is claimed because of her payment of sales and gasoline taxes in Irvine during her employment there. For the reasons hereinafter stated, we find it unnecessary to consider her taxpayer status.

## Discussion

We begin with an explanation of exactly what is not being decided in this case. We do not decide and express no opinion on whether Irvine's zoning practices have violated any rights of the plaintiffs, or even whether there is sufficient evidence on this issue to present a triable question of fact. This issue was not before the trial court on the motion for summary judgment and is not before this court. The only issue before us is whether plaintiffs lack standing to sue by reason of their failure to allege that a particular low cost housing project would have been built but for the city's zoning practices. For the purposes of this appeal, therefore, we will assume that Irvine's zoning practices purposefully excluded low and middle income persons, violating constitutional and statutory rights of the persons excluded and of those persons harmed by the adverse affect on the regional housing market. (*Warth* v. *Seldin, supra,* at p. 502 [45 L.Ed.2d at pp. 356-357].) By doing so, we can decide the issue at bar: whether or not the six plaintiffs in this case should be allowed to challenge the assumed violations in court.[3]

The relevant facts in *Warth* v. *Seldin* are practically identical to the facts in this case. Four of the individual plaintiffs in *Warth* were low or moderate income residents of Rochester, New York.[4] They alleged that a zoning ordinance in the nearby town of Penfield purposely excluded low and moderate income persons from living in the town. (422 U.S. at p. 495 [45 L.Ed.2d at pp. 352-353].) The alleged harm was that "Penfield's zoning practices had prevented them from acquiring, by lease or purchase, residential property in the town, and thus had forced them and their families to reside in less attractive environments." (422 U.S. at p. 496 [45 L.Ed.2d at p. 353].) Among other remedies, these plaintiffs sought declaratory and injunctive relief.

---

[3]It is not disputed that, under the proper circumstances, nonresidents can challenge the land use decisions of a city. (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 272 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541, 549 [99 Cal.Rptr. 745, 492 P.2d 1137].) Nor is it challenged that exclusionary zoning is a justiciable issue. (*Ogo Associates* v. *City of Torrance* (1974) 37 Cal.App.3d 830 [112 Cal.Rptr. 761]; *G & D Holland Construction Co.* v. *City of Marysville* (1970) 12 Cal.App.3d 989 [91 Cal.Rptr. 227].) Finally, Irvine does not deny that a city must consider the regional impact of its zoning practices. (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 607 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].)

[4]Although *Warth* also involved organizations and taxpaying individuals as plaintiffs, we need only be concerned with that part of the case dealing with the four individuals claiming standing because of their status as low or moderate income persons.

The court in *Warth* detailed a two-prong test for standing in exclusionary zoning cases and held that the four low and moderate income plaintiffs had failed that test. The *Warth* standard is that plaintiffs "must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a *substantial probability* that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the *asserted inability* of [plaintiffs] *will be removed.*" (422 U.S. at p. 504 [45 L.Ed. 2d at p. 358] italics added.)

The *Warth* plaintiffs lacked standing, the court said, because "the facts alleged fail to support an actionable *causal relationship* between Penfield's zoning practices and [plaintiffs'] asserted injury." (422 U.S. at p. 507 [45 L.Ed.2d at p. 359], italics added.) The court stated that the plaintiffs' "desire to live in Penfield always has depended on the efforts and willingness of third parties to build low- and moderate-cost housing." (422 U.S. at p. 505 [45 L.Ed.2d at p. 358].) Since the plaintiffs did not claim that a particular housing project which would have satisfied their needs would have been built in Penfield but for Penfield's zoning practices, they demonstrated to the court neither the "substantial probability" of a "causal relationship" between Penfield's actions and plaintiffs' injuries, nor that the requested relief would probably remove the harm. The court held that a plaintiff challenging zoning practices need not necessarily "have a present contractual interest in a particular project," but that "usually the initial focus should be on a particular project." (422 U.S. at p. 508, fn. 18 [45 L.Ed.2d at p. 360].)

Like the *Warth* plaintiffs, the plaintiffs in the present case have not alleged that Irvine's zoning practices prevented the construction of any particular project which would have met their housing needs. Instead, they have claimed generally that Irvine's "enforcement of the [zoning regulations] against third parties—developers, builders, and the like— has had the consequence of precluding the construction of housing suitable to their needs at prices they might be able to afford." (422 U.S. at p. 504 [45 L.Ed.2d at p. 358].)

We find nothing in the record that materially distinguishes the present plaintiffs from those in *Warth*. Therefore, it is clear that if this case is to be decided under the authority of *Warth*, none of the plaintiffs have standing. Plaintiffs' efforts to distinguish the case are unpersuasive. They argue that the "contention that they are injured by the effect of Irvine's housing practices on the regional housing market

survive[s] even the application of restrictive federal standing doctrine." The *Warth* plaintiffs made similar contentions, however. They asserted that Penfield "had made 'practically and economically impossible the construction of sufficient numbers of low and moderate income...housing in the Town of Penfield to satisfy the minimum housing requirements of both the Town of Penfield *and the metropolitan Rochester area....*'" (422 U.S. at p. 496 [45 L.Ed.2d at p. 353], italics added.) Without an allegation of one or more specific housing projects that were precluded by the zoning practices, there is no more "substantial probability" that the requested relief would cure the claimed regional injury to plaintiffs than there is that the relief would provide them housing in Irvine. The likelihood of cure for both injuries depends on the same factor: the probability that builders will construct housing for low and moderate income persons in Irvine.

 Since the outcome in this case depends on the applicability of *Warth*, the threshold issue is whether we are bound to follow the federal standing requirements. We hold that we are not. In *Doremus* v. *Board of Education* (1952) 342 U.S. 429, 434 [96 L.Ed. 475, 479-480, 72 S.Ct. 394], the Supreme Court said that state courts could decide federal constitutional questions on the merits even when the parties did not satisfy federal standing requirements. Indeed, the Supreme Court has expressly stated that "[t]he constitutional and prudential [standing] considerations canvassed at length in *Warth* v. *Seldin*...respond to concerns that are peculiarly federal in nature." (*Arlington Heights* v. *Metro. Housing Corp.* (1977) 429 U.S. 252, 262, fn. 8 [50 L.Ed.2d 450, 462, 97 S.Ct. 555].)

The applicability of *Warth* v. *Seldin* in California state cases has not been decided. It appears that *Warth* v. *Seldin* has been cited in only two California cases. In *Salton City etc. Owners Assn.* v. *M. Penn Phillips Co.* (1977) 75 Cal.App.3d 184 [141 Cal.Rptr. 895], the court held that an association of property owners had standing to sue as a representative of its members even though there was no allegation that the association itself was damaged by the defendant. The court noted that *Warth* had reached a contrary decision on the issue, but distinguished *Warth* on the facts of the case. (75 Cal.App.3d at p. 188.) In *Carsten* v. *Psychology Examining Com.* (1980) 27 Cal.3d 793 [166 Cal.Rptr. 844, 614 P.2d 276], the California Supreme Court denied a petition for a writ of mandate to compel the Psychology Examining Committee of the Board of Medical Quality Assurance to comply with certain provisions of the Business and Professions Code on the ground that the petitioner

lacked standing to sue. The court stated, "It is clear that since petitioner is neither seeking a psychology license, nor in danger of losing any license she possesses under the rule adopted by the board, she is not a beneficially interested person within the meaning of the statute [Code Civ. Proc., § 1086]. Our view under state law is consistent with federal law and a long line of decisions of the United States Supreme Court. (See, e.g., *Warth* v. *Seldin* (1975) 422 U.S. 490 [45 L.Ed.2d 343, 95 S.Ct. 2197]; *Simon* v. *Eastern Ky. Welfare Rights Org.* (1976) 426 U.S. 26 [48 L.Ed.2d 450, 96 S.Ct. 1917]. . . .)" (27 Cal.3d at p. 797.)

Respondent contends that the single reference in *Carsten* constitutes an express statement that the United States Supreme Court's decision in *Warth* v. *Seldin* is good law in California. Clearly it does not. An appellate court's citation of an opinion does not necessarily mean adoption of all aspects of the court's reasoning in the cited opinion. As plaintiffs point out, the California Supreme Court's treatment of *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 [36 L.Ed.2d 16, 93 S.Ct. 1278] is a good example. *Rodriguez* upheld the validity of a state school finance system attacked on the ground that it conditioned public school spending on district property wealth. *Rodriguez* was routinely cited by the California Supreme Court prior to *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929], certiorari denied (1977) 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951], in which the California court invalidated a school finance system virtually identical to the one upheld in *Rodriguez*. Moreover, even after *Serrano, Rodriguez* has been cited for various aspects of its equal protection analysis.[5]

Similarly, *Warth* was cited in *Carsten* v. *Psychology Examining Com., supra*, 27 Cal.3d 793, for the noncontroversial proposition that in order to have standing to seek a writ of mandate, a petitioner must be "beneficially interested." (See Code Civ. Proc., § 1086.) As the Supreme Court stated in *Carsten*, "The requirement that a petitioner be 'beneficially interested' has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be

---

[5]Cases citing *Rodriguez* prior to *Serrano* include *Johnson* v. *Hamilton* (1975) 15 Cal.3d 461, 468 [125 Cal.Rptr. 129, 541 P.2d 881]; *Gould* v. *Grubb* (1975) 14 Cal.3d 661, 671 [122 Cal.Rptr. 377, 536 P.2d 1337]; *People* v. *Feagley* (1975) 14 Cal.3d 338, 356, footnote 12 [121 Cal.Rptr. 509, 535 P.2d 373]; *Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 61 [115 Cal.Rptr. 247, 524 P.2d 375].

California cases citing *Rodriguez* since *Serrano* include *Bib'le* v. *Committee of Bar Examiners* (1980) 26 Cal.3d 548, 555 [162 Cal.Rptr. 426, 606 P.2d 733]; *Lucchesi* v. *City of San Jose* (1980) 104 Cal.App.3d 323, 333 [163 Cal.Rptr. 700].

served or some particular right to be preserved or protected over and above the interest held in common with the public at large." (*Carsten* v. *Psychology Examining Com., supra*, 27 Cal.3d 793, 796.)

Since there was no factual similarity between *Carsten* and *Warth*, the citation of *Warth* clearly referred to the general proposition stated, i.e., that to have standing, a writ of mandate petitioner must be beneficially interested. Our task is to determine whether the restrictive federal standing rule adopted in *Warth* is appropriate for determining if one has standing under California law. For reasons stated herein, we conclude that it is not.

In cases challenging governmental actions, the standing requirement is the rudder that allows courts to navigate between two equally objectionable hazards. On the one side is the risk that the judiciary will impinge upon the powers of the other branches of government by issuing advisory opinions. A court cannot reach out on its own to review the actions of the executive or the Legislature. The validity of such actions may only be passed upon when challenged by a litigant whose legal rights have been violated thereby. "The province of the court is, solely, to decide on the rights of individuals." (*Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137, 170 [2 L.Ed. 60, 71].)[6] Were the courts to stray too far towards the advisory opinion hazard we would approach "that state of affairs where standing may be conferred on a plaintiff whose only concern is concern itself." (Sager, *Insular Majorities Unabated: Warth* v. *Seldin and City of Eastlake* v. *Forest City Enterprises, Inc.* (1978) 91 Harv. L.Rev. 1373, 1378.)

But, the farther a court goes to avoid the advisory opinion hazard, the closer it comes to the opposite hazard: the shutting off of all reasonable avenues of judicial redress to a truly aggrieved plaintiff. The concern for this problem was expressed by Mr. Justice Douglas when he wrote that "the American dream teaches that if one reaches high enough and persists there is a forum where justice is dispensed. I would

---

[6]Before becoming Chief Justice, John Marshall spoke in the House of Representatives about the limits on judicial power. Although his comments referred to the federal courts, the theme is equally relevant here: "'By extending the Judicial power to all cases in law and equity, the Constitution had never been understood to confer on that department any political power whatever. To come within this description, a question must assume a legal form for forensic litigation and judicial decision. There must be parties to come into court, who can be reached by its process, and bound by its power; whose rights admit of ultimate decision by a tribunal to which they are bound to submit.'" (Baker, John Marshall: A Life In Law (1974) p. 322.)

lower the technical barriers and let the courts serve that ancient need." (*Warth* v. *Seldin, supra*, 422 U.S. 490, 519 [45 L.Ed.2d 343, 366] (dis. opn. of Douglas, J.).)

Applying these broad principles to the present case, we note that the courts are not designed to supervise the land use planning of California's cities. The judiciary may only inquire into a zoning ordinance when a legally interested litigant complains that it is harmful to him. To do more would be to appropriate a power rightfully belonging to the Legislature. But, in exercising judicial restraint, we must not construct obstacles so great as to deny any chance of relief to those persons who are injured by illegal zoning practices.

By following *Warth*, the trial court erred by creating too large an obstacle to the plaintiffs' opportunity to challenge Irvine's zoning practices. This conclusion is consistent with the principles of standing that have been adhered to by California courts in the past.

 Like the federal courts, California's judiciary has no power to issue advisory opinions. (*Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 118-120 [145 Cal.Rptr. 674, 577 P.2d 1014].) Thus, a plaintiff must have a "personal interest in the outcome of the litigation." (*Carsten* v. *Psychology Examining Com., supra*, 27 Cal.3d 793, 798.) "One who invokes the judicial process does not have 'standing' if he...does not have a real interest in the ultimate adjudication because the actor has neither suffered nor is about to suffer any injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented." (*California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16, 22-23 [61 Cal.Rptr. 618].) More specifically, "[t]o challenge the constitutionality of a statute on the ground that it is discriminatory, the party complaining must show that he is a party aggrieved or a member of the class discriminated against." (*Estate of Horman* (1971) 5 Cal.3d 62, 77-78 [95 Cal. Rptr. 433, 485 P.2d 785], cert. den. *sub nom., Gumen* v. *California* (1972) 404 U.S. 1015 [30 L.Ed.2d 662, 92 S.Ct. 672].)

 One of plaintiffs' allegations is that Irvine's zoning practices unlawfully discriminate against low and moderate income persons. Plaintiffs allege that they are "member[s] of the class discriminated against." Plaintiffs also allege that the restrictive zoning practices in Irvine adversely affect the regional housing market so that their housing costs have been increased. Thus, the complaint alleges facts showing

that they are aggrieved and have a "real" and "personal interest in the outcome of the litigation" on this issue.

Under the *Warth* standard, a "causal relationship" between the acts of the city and the injuries asserted would be required to be demonstrated by alleging a specific housing project that would have been built but for the zoning practices. The "causal relationship" and "substantial probability" requirements show the concern that the practices being attacked may be irrelevant to the injuries; that even if the city had the least restrictive zoning ordinances imaginable, the plaintiffs would be in no better position until third parties, the builders, voluntarily made the commitment to construct housing for low and moderate income persons.

■ We hold that standing to challenge exclusionary zoning practices in California does not depend on plaintiffs showing a "substantial probability" that their injuries would not exist but for those practices. It is sufficient that they show a causal relationship by alleging that the city's zoning practices have excluded them from desired residency in that city or that those practices have raised their housing costs outside that city by adversely affecting the regional housing market. Such allegations show membership in the class discriminated against and the "real" and "personal" interest that entitles plaintiffs to bring the action. To require more would deny access to the courts to plaintiffs with legitimate justiciable causes.

The difference between our holding and the *Warth* standard is the degree of certainty that granting the requested relief will redress the plaintiffs' injury. We do not require that the likelihood of successful redress be established as a "substantial probability" for standing purposes. The mere fact that granting relief in this case will not remove all obstacles from the plaintiffs' path to complete redress (i.e., the courts cannot order the actual construction of housing) is not sufficient reason to deny plaintiffs access to the courts. It must be remembered that having standing to sue is not the same as prevailing on the merits. Plaintiffs must still prove their injuries at trial and prove that those injuries are the result of a breach of duty by the defendant. We simply hold that the plaintiffs are entitled to attempt such proof.[7]

[7]Respondent argues that it is "plaintiffs' own poverty and conditions in the regional housing market, not the city's conduct, [that] prevent plaintiffs from locating 'affordable' housing." This is not relevant to issues on appeal. Irvine will have an opportunity to prove this at trial, or could have attempted to show the lack of a triable question of fact on this issue in a summary judgment proceeding on the merits. It was Irvine's choice, however, to move for summary judgment on the issue of standing only.

Applying the *Warth* standard in California would have the effect of putting the most restrictive zoning ordinances beyond judicial review. The more restrictive a city's zoning becomes, the less likely it will be that a builder will propose a housing project that would satisfy the needs of the excluded group. Such an act by a builder becomes an increasingly futile gesture. Without a proposed project, however, plaintiffs could not meet *Warth*'s "substantial probability" test.

In addition to conforming to California general standing principles, our holding is reinforced by the trend in this state to apply less stringent rules to cases litigating issues in the public interest. One court has noted the "marked accommodation of formerly strict procedural requirements of standing to sue [citation]...where matters relating to the 'social and economic realities of the present-day organization of society' [citation] are concerned." (*Residents of Beverly Glen, Inc. v. City of Los Angeles* (1973) 34 Cal.App.3d 117, 122 [109 Cal.Rptr. 724].) Another court stated that "[w]ere there any doubt about the justiciability of the controversy, that doubt would be resolved in favor of present adjudication, because the public is interested in the settlement of the dispute." (*California Water & Telephone Co. v. County of Los Angeles, supra*, 253 Cal.App.2d 16, 26.)

Certainly the need for moderate and low cost housing in the region where industrial development has provided a large employment market is one of the "social and economic realities of the present-day organization of society." This reality is reflected in the California zoning laws and in the opinions of the California Supreme Court.

Under the zoning laws all county and city zoning ordinances are required to be consistent with a general plan for the comprehensive, long-term physical development of the county or city. (Gov. Code, § 65860.) The laws further provide that every general plan shall include, inter alia, a housing element which "shall make adequate provision for the housing needs of all economic segments of the community." (Gov. Code, § 65302, subd. (c).)[8]

---

[8]Operative October 1, 1981, Government Code section 65302, subdivision (c) will require every general plan to include "[a] housing element as provided in Article 10.6 (commencing with Section 65580)." (Stats. 1980, ch. 1143, § 2, p. 3694.) Article 10.6 was recently added to the Government Code and includes section 65583, which states in part, "The housing element...shall make adequate provision for the existing and projected needs of all economic segments of the community." (Stats. 1980, ch. 1143, § 3, p. 3698.)

That this mandate imposes upon cities and counties a responsibility to provide a fair share of the regional housing has been recognized in the regulations implementing the statute. The Department of Housing and Community Development, charged with the duty of adopting guidelines for the preparation of housing elements required by section 65302, has stated:

"Because local housing policies and programs have market area as well as local impact, and because housing need is a function of the general housing market, it is not enough for a locality to measure its responsibilities to the community in terms of the housing needs of its resident population. In addition, each locality within a general housing market area shares with other localities the collective responsibility for making adequate provision for the housing needs of all economic segments of the market area population. Therefore, the housing element also must be responsive to the housing needs of a fair share of those households who do not live in the locality but whose housing opportunities are affected by the planning decisions of the locality.

"For housing element purposes the community to be served by the local housing element includes a fair share of those market area households determined pursuant to Article 2 of these Guidelines, who would live within the local jurisdiction were a variety and choice of housing appropriate to their needs available." (Cal. Admin. Code, tit. 25, § 6418.)

In view of the legislative mandate that cities and counties are to be responsive to the housing needs of persons who are not a part of their resident population, it seems clear that persons aggrieved by their failure to respond to such needs are persons with a "real" and "personal" interest.

Respondent contends that the zoning laws, together with recent amendments, provide an adequate remedy for victims of exclusionary zoning practices in California so that it is unnecessary to recognize plaintiffs' standing in order to provide judicial redress to such victims. Respondent refers specifically to Assembly Bill No. 2853, adopted by the California Legislature and signed by the Governor in late September 1980. (Stats. 1980, ch. 1143, p. 3694.) The act amends section 65302 of, and adds article 10.6 (commencing with § 65580) to, chapter 3 of division 1 of title 7 of the Government Code to require municipalities to plan in the housing element of their general plan for meeting

their "appropriate share of the regional demand for housing" of all economic segments of the community, and to require each municipality to conform its housing element to the new law on or before October 1, 1981.

Although respondent contends that the new law provides a remedy for the victims of exclusionary zoning, respondent fails to explain how even the new law affects the standing issue, which is the only issue before this court.

Under Government Code section 65860, subdivision (b) "[a]ny resident or property owner within a city or a county, as the case may be," may bring an action to enforce compliance with subdivision (a) which requires that zoning laws be consistent with the general plan, which in turn must include the housing element as heretofore described.

This does not, as respondent claims, provide a remedy for plaintiffs. The very gravamen of their complaint is that they are not residents because of the exclusionary zoning practices. Moreover, denial of standing to such excluded residents would in practical effect mean that no private right exists to enforce the statutory requirements. It is unlikely that the residents will challenge their city's failure to provide its share of the regional housing needs, since they are not personally aggrieved. It is even less likely that developers will be willing to incur the expense of planning and proposing a project which is inconsistent with local practices. As previously noted, the more restrictive the practices the less likely they are to be challenged by developers.

Therefore, the social and economic realities of the housing market are that unless the persons most aggrieved by exclusionary zoning practices, the excluded, have standing to sue, the practices are likely to go unchallenged until some state agency gets around to investigating violations of the new law.

Our decision not to apply the *Warth* standard is consistent with decisions from other states.[9] In *Home Builders League* v. *Township of*

---

[9]We have found only one relevant state case that appears to favor the *Warth* standard. That court, however, reserved actual determination of the issue "for a more appropriate case." (*Raum* v. *Board of Supervisors of Tredyffrin Tp.* (1975) 20 Pa. Commw.Ct. 426 [342 A.2d 450, 458, fn. 16].)

*Berlin* (1979) 81 N.J. 127 [405 A.2d 381], the New Jersey Supreme Court stated that "we are not bound by *Warth*, and insofar as its requirements are more restrictive than what we have traditionally demanded of plaintiffs to establish standing, we have chosen not to follow it." (405 A.2d at p. 383.) Relying on case law and a state statute,[10] the court found standing to sue in an association of builders, which was challenging a zoning ordinance, even though there was no allegation that any specific project had been precluded by the ordinance. The court noted that in *So. Burlington Cty N. A. A. C. P.* v. *Tp. of Mt. Laurel* (1975) 67 N.J. 151 [336 A.2d 713, 717, fn. 3], appeal dismissed, 423 U.S. 808 [46 L.Ed.2d 28, 96 S.Ct. 18] (an action brought by, among others, nonresident low income persons to challenge a township's zoning regulations for excluding low and moderate income families), it had held that nonresident individuals had standing to sue even though "there was no guarantee that plaintiffs..., even if successful, would obtain what they were seeking, *i.e.,* decent housing in Mount Laurel." (405 A.2d at p. 385.)

Similar results have come from New Jersey's lower courts. In *Urban League of Essex Cty.* v. *Tp. of Mahwah* (1977) 147 N.J.Super. 28 [370 A.2d 521], three individual plaintiffs, two of whom resided outside the state, were held to have standing to seek declaratory and injunctive relief against a township whose zoning ordinances allegedly excluded potential residents on the basis of race, national origin and economic status. This was the holding despite the fact that none of the plaintiffs alleged "any attempt to purchase or rent any dwelling, obtain a variance, or take any other steps to secure housing in the defendant communities." (370 A.2d at p. 523.) The court, in reversing the dismissal of the action, stated that the "trial judge's reliance upon *Warth*...was inappropriate." (370 A.2d at p. 524. See also *Urban League of Greater New Brunswick* v. *Mayor & Council of Carteret* (1979) 170 N.J.Super. 461 [406 A.2d 1322, 1325], certification granted, Jan. 7, 1980, 82 N.J. 283 [412 A.2d 789].)

A New York trial court has also rejected the *Warth* standard. In *Suffolk Housing Serv.* v. *Town of Brookhaven* (1977) 91 Misc.2d 80 [397 N.Y.S.2d 302], modified (1978) 63 App.Div.2d 731 [405 N.Y.S.

---

[10]The New Jersey Legislature defined an "'interested party'" in zoning matters as "'any person, whether residing within or without the municipality, whose right to use, acquire, or enjoy property is or may be affected by any action taken under this act....'" (405 A.2d at p. 384.)

2d 302], it was reasoned that requiring plaintiffs "to establish affiliation with a specific project as a precondition of access to a judicial remedy ... would compel potential plaintiffs to obtain the assistance of beneficent landowners willing to create specific projects for the sole purpose of instituting litigation. There is not always an identity of interest between landowners and those excluded by zoning restrictions [citation], particularly where the complaint is not that multi-family housing is prohibited in Brookhaven, but only that it is so restricted as to exclude the poor and racial minorities." (397 N.Y.S.2d at p. 310.)

### *Conclusion*

We do not share the concern expressed in *Warth* that plaintiffs' dependence on third party builders to obtain housing may render a trial court's decision advisory. We *are* concerned that making plaintiffs' standing to challenge exclusionary zoning practices dependent on the discretionary acts of the housing construction industry (i.e., the proposal of projects) will unjustly deny the plaintiffs access to judicial redress.

The judgment against the plaintiffs is reversed.

Tamura, Acting P. J., and McDaniel, J., concurred.

A petition for a rehearing was denied January 28, 1981, and respondent's petition for a hearing by the Supreme Court was denied March 18, 1981.