[No. A101842. First Dist., Div. Four. Feb. 24, 2004.]

CORAL CONSTRUCTION, INC., Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

**COUNSEL**

Pacific Legal Foundation, John H. Findley, Stephen R. McCutcheon, Jr., and Arthur B. Mark III for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, Wayne K. Snodgrass, Teresa L. Stricker and Sherri Sokeland Kaiser, Deputy City Attorneys; Moscone, Emblidge & Quadra and G. Scott Emblidge for Defendants and Respondents.

**OPINION**

**RIVERA, J.—**

## I. INTRODUCTION

Coral Construction, Inc., (Coral) filed this action against the City and County of San Francisco and other individual defendants (collectively, City) challenging the constitutionality of City's Minority/Women/Local Business Utilization Ordinance (the Ordinance). In essence, Coral alleges that the Ordinance's provisions granting preferential treatment to women-and

minority-owned businesses in bids for City contracts violates article I, section 31 of the California Constitution (Proposition 209). On summary judgment, City successfully challenged Coral's standing to sue for injunctive and declaratory relief, on the ground that Coral had failed to prove it would be bidding on an identifiable City contract subject to the Ordinance in the reasonably near future. We conclude that Coral's standing to challenge the ordinance does not depend upon the identification of a specific contract on which it will bid in the near future, and accordingly, we reverse.

## II. BACKGROUND FACTS AND PROCEDURAL HISTORY

### A. *The Ordinance*[1]

The Ordinance is codified in chapter 12D.A. of the San Francisco Administrative Code. Its relevant provisions are summarized by the director of San Francisco's Human Rights Commission (HRC):

"Under section 12D.A.9(A) ('Bid Discount Program'), City departments must give specified percentage discounts to bids . . . submitted by businesses certified by the HRC as minority business enterprises ('MBEs'), woman business enterprises ('WBEs'), local business enterprises ('LBEs'), as well as joint ventures with appropriate level of MBE, WBE or LBE participation. [¶] Under section 12D.A.17 ('Subcontracting Program'), bidders for certain types of prime City contracts must demonstrate their good faith efforts to provide certified MBEs and WBEs an equal opportunity to compete for subcontracts. A bidder may comply with the Subcontracting Program by documenting its good faith efforts to inform MBEs and WBEs of subcontracting opportunities. Bidders who show that they plan to use MBE and WBE subcontractors at a level one would expect absent discrimination need not document their good faith efforts."[2] Any prime contract bid that fails to comply with the subcontracting program is declared nonresponsive.

### B. *Coral's Work and Bidding History*

Coral is a "specialty highway contractor" whose primary work involves the installation of road and freeway signage as well as guardrails and other safety

---

[1] The Ordinance took effect in November of 1998, and was reenacted in virtually identical form in June of 2003. Prior to November 1998, a different Minority/Women/Local Business Utilization Ordinance was in effect; the provisions of that ordinance are substantially similar to the 1998 Ordinance, insofar as they are relevant to the core issues of this appeal.

[2] The "level [of MBE/WBE subcontractor work] one would expect absent discrimination" is set by the HRC director and her staff. It is based on the "subcontracting opportunities presented by a particular contract and the availability of certified MBEs and WBEs qualified to do the type of work involved on the contract."

appurtenances.[3] Virtually all of Coral's work is in the public sector. Although headquartered in Oregon, Coral performs a large percentage of its work in California, including in the Bay Area. During the five years prior to the filing of this action (1997 to 2001) an average of 40 percent to 50 percent of Coral's total revenues came from its work in California. For the same five years, the gross revenues from Coral's work for City have comprised approximately 5 percent of Coral's total revenue.

In 2002 Coral acquired a controlling interest in D.C. Hubbs Construction, Inc., a California public works contractor. As a result, Coral now has the capability to do additional types of work, in particular, airport construction work. According to Jay Minor, Coral's chief operating officer, "[t]his acquisition increases Coral's opportunities for bidding on and for performing public works projects in California (including [City's] public construction projects) and does so with less subcontracting of work out to other firms."

Coral has been bidding on City's projects since 1996. In 1996 Marinship Construction Services was awarded a bid for work at the new international terminal at the San Francisco International Airport; Coral was the subcontractor for signs and sign structures. In 1997 Coral bid as a subcontractor for work on the relocation of McDonald Road, but the prime contract bid was unsuccessful. In 1997 Coral was also the subcontractor on a successful bid by Kulchin Condon Associates for work on the inbound/outbound terminal ramps at the airport. In 2000 Coral was invited to negotiate a supplemental contract for additional work in the terminal areas. The negotiations were successful, and Coral completed the additional work "on a fast-track schedule in time for the opening of the new terminal in the Summer of 2000."

In 2000 the airport put out to bid a project for additional signage at the airport (contract No. 5904.A). Two companies submitted bids: Coral and Agnotti & Reilly. Coral's bid did not include any subcontractors because Coral intended to do all of the work with its own crew.[4] Coral was the low

---

[3] Coral lists the following as work it regularly performs: "metal guardrail, break away anchors, permanent and temporary highway signing (both ground mount and overhead, including the steel structures, footings and electrical work), precast concrete median barrier, chain link fence, metal bridge and pedestrian rail, impact attenuators and sand barrels, signal structures, guide posts, traffic controls, delineators, electronic changeable message signs (including wiring, conduit, etc.), sound walls (including wood, masonry or concrete), small retaining walls, small concrete free standing walls, rock slope screening and fence protection, small concrete paving and drainage projects, excavation, embankment, hauling, clear and grub, seeding and mulching, blast fencing, exterior and interior building signage . . . , thrie beam barriers, wire mesh overhead rock protection, etc."

[4] According to Minor, "Coral is 'An Equal Opportunity Employer,' [whose employees] are hired without any consideration of their race, sex, ethnicity, color, or national origin. As a result, Coral's work crews are high quality and 'diverse' . . . ."

bidder; however, its bid was rejected as nonresponsive. The project manager wrote: "Specifically, Coral's bid failed to demonstrate compliance with subcontracting goals in that it failed to list its MBE/WBE subcontractors in its bid . . . . Coral also failed to demonstrate that it made sufficient good faith efforts to utilize MBE/WBE subcontractors by its failure to submit adequate Good Faith Efforts documentation . . . . The MBE & WBE goals for this contract are 11% and 5% respectively." The bid was awarded to Agnotti & Reilly, whose bid exceeded Coral's by 22 percent.[5]

After filing this action in September 2000, Coral continued to consider and to bid on projects in San Francisco.[6] In 2001 Coral submitted a subcontract bid to JMB Construction for additional work at the San Francisco International Airport. Coral was accepted as the subcontractor and JMB was awarded the contract. Although Coral purchased the materials necessary to complete the work, in March 2002 this portion of the project was cancelled. The project manager stated that the cancellation occurred solely due to the post-September 11 declining economy and the resultant decline in airport revenues.

In January 2002, Coral purchased the plans and specifications for another airport project (taxiway Z bypass), but chose not to submit a bid for various reasons, including the relatively short workday count, Coral's work commitments on other projects, and the high (17 percent) disadvantaged business enterprise (DBE) goal (applying a federal regulation, not City's Ordinance) set forth in the bid documents. In June 2002, Coral bought the plans and specifications for two projects: the Lake Merced-John Muir Drive fishing pier and parking lot and the light rail transit project on Third Street. Coral declined to bid on the smaller Lake Merced project, but was solicited to submit bids as a subcontractor for the light rail project (also governed by federal regulations rather than the Ordinance). Coral submitted bids to 13 potential prime bidders and was the subcontractor on two of the three "apparent" low bids.[7]

---

[5] It appears from the declaration of City's HRC director that Agnotti & Reilly's bid included a certified MBE as the subcontractor for the roadside signage. (The Agnotti & Reilly bid and its list of subcontractors are referred to as exhibits to the declaration of Mr. Tsai, the project manager, but are not included in the record.)

[6] We are mindful that a defect in standing cannot be cured by postfiling events. (*Steger v. Franco, Inc.* (8th Cir. 2000) 228 F.3d 889, 893.) However, as will be made clear, we conclude the facts as they existed at the time of the complaint were adequate to establish standing. We recite the postcomplaint facts to provide an accurate summary of the record, and as evidence tending to prove Coral's allegation, in the first amended petition and complaint, that it intends to continue bidding on City contracts.

[7] As of August 2002, the date of the summary judgment motion, the contract had not been awarded.

## C. *Additional Facts*

In his declaration opposing summary judgment Jay Minor states Coral is "ready, willing, and able and is continuing to bid on all appropriate and available opportunities that arise within its specialty areas of work in the San Francisco Bay Area. Specifically, Coral is awaiting further opportunities to bid on City projects at the Airport and within the City. When such opportunities arise, Coral is ready, willing, and able and intends to bid again and work on such projects . . . ." Coral's work meets all professional standards and "[City] ha[s] never rejected any of Coral's . . . work on [its] projects for failure to perform in a professional and workman-like manner, for failure to perform to contract specifications, for inadequate bonding or insurance, for lack of appropriate licensing, or for inability to perform."

Minor further avers that Coral is placed at a severe competitive disadvantage when it bids on City contracts because, inter alia, its contract bids are not entitled to the discounts that apply to WBE and MBE contractors and subcontractors, and if it complies with the Ordinance, its expenses are increased by the cost of outreach to MBE's and WBE's. Further, the Ordinance requires Coral to use MBE and WBE subcontractors rather than its own employees or other subcontractors of its own choosing, and to discriminate against enterprises not owned by women or minorities who may want to participate as subcontractors. Minor states Coral is placed at risk of liability for such discrimination.

## D. *City's Evidence*

City presented voluminous declarations and exhibits demonstrating the following facts:

All of Coral's contracts or bids have been for erecting and installing large, overhead roadway signs. As of the date Coral filed its complaint, City "only rarely" let contracts that involved the kind of signage work performed by Coral, and no MBE's or WBE's were certified to do this kind of work. Coral never competed directly with a WBE or MBE either as a prime contractor or as a subcontractor. Coral has bid on only one prime contract let by City.

Before filing its complaint Coral had bid as a subcontractor on three City projects, but these bids were under the pre-1998 ordinance. Coral did not submit bids for signage work included in three department of public works (DPW) projects let for bids in the three-year period from 1997 to 2000. D.C. Hubbs has never submitted a bid on any City contracts. Certain City contracts are not subject to the Ordinance (e.g., contracts funded by state or federal funds, contracts for emergency services or construction, and contracts for over $10 million).

City also presented evidence that the next three to five years (i.e., 2002–2007) would produce few, if any, bidding opportunities for Coral. City did identify the aforementioned Third Street light rail transit project on which Coral has participated as a subcontract bidder. City also identified a DPW project that entails the installation of overhead signage but noted it would be subject to the California Department of Transportation's DBE requirements and not City's Ordinance. Finally, City presented a declaration from the airport's manager of the bureau of design and construction. He stated the airport has "no current plans to put out to bid any further City contracts involving the installation of overhead traffic signage or the erection of overhead sign structures." However, he was "hopeful" that by 2007 the airport would have sufficient resources to complete the AirTrain expansion project, which would include construction of an overhead sign bridge. Although the declarant did not so state, the implication is that Coral would be expected to bid on this project and, like the other airport projects, it would be subject to the Ordinance.

E. *The Motions and the Trial Court's Ruling*

Coral filed motions for summary judgment, summary adjudication, judgment on the pleadings, peremptory writ of mandate and preliminary injunction. City filed a cross-motion for summary judgment. In its motion, City argued that Coral's facial challenge to the Ordinance was not ripe for adjudication and was barred by the statute of limitations. The motion's primary ground, however, was that Coral lacked standing to challenge future enforcement of the Ordinance because "Coral cannot identify specific facts supporting its claim that [the Ordinance] will cause Coral to suffer a future injury that is both (1) concrete and particularized, and (2) imminent." City's motion for summary judgment was granted.[8] In a nutshell, the court ruled "the undisputed evidence establishes that, at the time Coral filed its complaint, Coral did not face an 'invasion of a legally protected interest' from the Ordinance that is both (a) 'concrete and particularized[,'] and (b) 'actual or imminent.' [Citations.]" Judgment in favor of City was entered on the order, and Coral filed this timely appeal.[9]

## III. DISCUSSION

A. *Standard of Review*

The standard of review of a summary judgment in favor of a defendant is well settled. We "independently assess the correctness of the trial court's

---

[8] Coral's motion for summary judgment was denied; Coral's other motions were denied as moot.

[9] City purports to cross-appeal from the trial court's June 1, 2001, order overruling its first demurrer to Coral's fourth cause of action for damages. This is a nonappealable order, and City has not addressed its cross-appeal in its briefing; therefore, we deem the cross-appeal waived.

ruling by applying the same legal standard as the trial court in determining whether any triable issues of material fact exist, and whether the defendant is entitled to judgment as a matter of law." (*Rubin v. United Air Lines, Inc.* (2002) 96 Cal.App.4th 364, 372 [117 Cal.Rptr.2d 109].) In doing so, "we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the opposing party." (*Ibid.*)

B. *Applicable Legal Standards for Standing*

■ An action challenging a legislative act cannot be brought by any individual or entity that disagrees with it. In order to invoke the aid of the courts, a plaintiff "must be beneficially interested in the controversy; that is, he or she must have 'some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' [Citation.]" (*Holmes v. California Nat. Guard* (2001) 90 Cal.App.4th 297, 315 [109 Cal.Rptr.2d 154].) Our Supreme Court has held that "[t]his standard . . . is equivalent to the federal 'injury in fact' test, which requires a party to prove by a preponderance of the evidence that it has suffered 'an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." ' (*Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville* (1993) 508 U.S. 656, 663 [124 L.Ed.2d 586, 113 S.Ct. 2297] . . . .)" (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 362 [87 Cal.Rptr.2d 654, 981 P.2d 499] (*Associated Builders*).) [10]

---

[10] In so holding the court did not address *Stocks v. City of Irvine* (1981) 114 Cal.App.3d 520, 528 [170 Cal.Rptr. 724] (*Stocks*) which concluded that state courts are not bound to follow federal standing requirements, founded as they are upon " 'peculiarly federal' " prudential concerns. The court in *Stocks* relied instead on the definition of standing set forth in *Estate of Horman* (1971) 5 Cal.3d. 62, 77–78 [95 Cal.Rptr. 433, 485 P.2d 785]: " '[T]o challenge the constitutionality of a statute on the ground that it is discriminatory, the party complaining must show that he is a party aggrieved *or a member of the class discriminated against.*' " (*Stocks, supra,* 114 Cal.App.3d at p. 531, italics added.) Thus, to have standing the plaintiffs need only show "that they are aggrieved and have a 'real' and 'personal interest in the outcome of the litigation.' . . ." (*Id.* at pp. 531–532.) In addition, the court observed, "[o]ne court has noted the 'marked accommodation of formerly strict procedural requirements of standing to sue [citation] . . . where matters relating to the "social and economic realities of the present-day organization of society" [citation] are concerned.' " (*Id.* at p. 533.) Thus, if there is doubt as to the justiciability of a controversy, " 'that doubt would be resolved in favor of present adjudication[where] the public is interested in the settlement of the dispute.' " (*Ibid.,* quoting *California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 26 [61 Cal.Rptr. 618] (*California Water*).)

Contrary authority may be found in *Torres v. City of Yorba Linda* (1993) 13 Cal.App.4th 1035 [17 Cal.Rptr.2d 400]. There, the court *said* it "disagree[d]" with the standing analysis in *Stocks* but then cited language that is consistent with *Stocks*: "California decisions, like the federal courts, generally require a plaintiff to have a personal interest in the litigation's

### 1. *Concrete and Particularized Injury*

In *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville, supra,* 508 U.S. at page 658 (*Northeastern Fla.*), a trade association challenged an ordinance adopted by the City of Jacksonville requiring that 10 percent of the amount spent on city contracts be set aside each year for MBE's. The petitioner, most of whose members did not qualify as MBE's, alleged that "many of its members 'regularly bid on and perform construction work for the City of Jacksonville,' and . . . 'would have . . . bid on . . . designated set aside contracts but for the restrictions imposed.' " (*Id.* at p. 659.) The court of appeals concluded that the petitioner lacked standing because "it 'has not demonstrated that, but for the program, any AGC member would have bid successfully for any of these contracts,' [citation]." (*Id.* at p. 660.)

The Supreme Court reversed, stating that such proof was not necessary to establish standing. (*Northeastern Fla., supra,* 508 U.S. at p. 669.) "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." (*Id.* at p. 666.) "To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." (*Ibid.,* fn. omitted.)

Similarly, in *Monterey Mechanical Co. v. Wilson* (9th Cir. 1997) 125 F.3d 702, 704 (*Monterey Mechanical*), a contractor's bid was rejected for failure to comply with a state statute requiring a prime contractor to subcontract 23 percent of its work to minority-owned, women-owned and disabled-veteran-owned businesses or to demonstrate a " 'good faith effort' " to meet those

---

outcome." (*Torres,* at p. 1046.) The court in *Torres* also distinguished *Stocks* on the ground that the " 'public interest' " exception to the strict standing rules "is usually applied in cases where an association sues on behalf of its members." (*Torres,* at p. 1046.) This may not be entirely accurate. (See *California Water, supra,* 253 Cal.App.2d at p. 26 ["public interest" factor applied to issue of justiciability in action filed by public utilities challenging a county water ordinance that could apply to them in the future]; *County of Colusa v. Strain* (1963) 215 Cal.App.2d 472, 477–478 [30 Cal.Rptr. 415]; *Collier v. Lindley* (1928) 203 Cal. 641, 644–645 [266 P. 526].)

We leave for another day the untangling of these jurisprudential threads, because we here conclude that Coral has adequately demonstrated standing to challenge the Ordinance under the federal standard.

goals. The other bidder on the project submitted documentation demonstrating compliance with the " 'good faith' requirement" of the statute, and was awarded the contract. (*Ibid.*) The trial court found Monterey Mechanical had no standing to sue because "all general contractors, not just non-minority non-women contractors, were bound by the same requirements" and, therefore, the application of the statute did not cause Monterey Mechanical to lose the contract. (*Id.* at p. 706.)

The Ninth Circuit reversed. (*Monterey Mechanical, supra*, 125 F.3d at p. 715.) Following *Northeastern Fla.,* it held: "A bidder need not establish that the discriminatory policy caused it to lose the contract. To establish standing bidders 'need only show that they are forced to compete on an unequal basis.' [Citation.] Being forced to compete on an unequal basis because of race (or sex) is an injury under the Equal Protection Clause." (*Monterey Mechanical*, at p. 707.)

### 2. *Injury That Is Actual or Imminent, Not Conjectural or Hypothetical*

■ The second half of the "injury in fact" test requires that the party seeking future relief from the provisions of an allegedly unconstitutional ordinance show "actual or imminent" as opposed to "conjectural or hypothetical" harm from its application. (*Lujan v. Defenders of Wildlife* (1992) 504 U.S. 555, 560 [119 L.Ed.2d 351, 112 S.Ct. 2130] (*Lujan*).) Where a petitioner seeks declaratory or injunctive relief, it is insufficient that he has been injured in the past; "he must instead show a very significant possibility of future harm in order to have standing. [Citation.]" (*Bras v. California Public Utilities Com'n* (9th Cir. 1995) 59 F.3d 869, 873 (*Bras*).) As we have described, this does not mean the petitioner must demonstrate it will lose a contract bid under the allegedly illegal ordinance. Rather, in this context, it means the petitioner-contractor must show that "sometime in the relatively near future it will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors." (*Adarand Constructors, Inc. v. Pena* (1995) 515 U.S. 200, 211 [132 L.Ed.2d 158, 115 S.Ct. 2097] (*Adarand*); see also *Coral Const. Co. v. King County* (9th Cir. 1991) 941 F.2d 910, 930 (*Coral Const.*) [allegation that it will continue to bid on contracts on an unequal basis is sufficient to confer standing].)

That the bidder's ability and readiness to bid is subject to some delay outside the control of the bidder does not preclude a finding of imminence. In *Bras*, Pacific Bell required service providers to "prequalif[y]" in order to bid on contracts. The prequalification form awarded 10 points to certified minority- and women-owned business enterprises, which Bras was not. Bras

failed to prequalify, despite a history of satisfactory service provided to Pacific Bell. Bras was informed that he would have prequalified if the 10 points for minority- and women-owned businesses had not been considered. (*Bras, supra*, 59 F.3d at p. 871.) Bras sued for damages and sought injunctive and declaratory relief. The damage claim was settled. The remaining claims were dismissed for lack of standing. (*Id.* at pp. 871–872.) The Ninth Circuit reversed. (*Id.* at p. 876.)

In his complaint, Bras did not allege any *present* intention to bid on contracts for Pacific Bell. Indeed, Bras was precluded from submitting bids for a three-year period "because [the utility] ha[d] entered into long-term business relationships with three architects that [were then] used for all of its architectural service needs." (*Bras, supra*, 59 F.3d at p. 873.) But at the end of the three-year hiatus Bras was free to fill out a new prequalification form. "That Bras can only compete for long-term contracts every several years rather than on a project-by-project basis does not change the analysis." (*Ibid.*) Bras presented evidence of his willingness and desire to continue to contract with Pacific Bell for his services, and of Pacific Bell's satisfaction with his services in the past. The court concluded, "[t]his evidence is sufficient to establish, for purposes of summary judgment, that Bras will suffer future injury if the program is not enjoined." (*Id.* at p. 874.)

In contrast, the plaintiff in *Cornelius v. Los Angeles County etc. Authority* (1996) 49 Cal.App.4th 1761 [57 Cal.Rptr.2d 618] (*Cornelius*) failed to meet minimal standing requirements. In *Cornelius,* the plaintiff, a licensed engineer, brought an action challenging the constitutionality of the DBE program of the metropolitan transit authority (MTA). The program, adopted to comply with federal regulations, required that 10 percent of the MTA's projects be awarded to DBE's and set participation goals for DBE's as subcontractors on prime contracts. (*Id.* at p. 1764.)

Cornelius had worked for a company that had participated as a subcontractor in a bid to build a metro station. The prime contractor's bid had been rejected, even though it was the lowest bid, because it failed to satisfy the requirements of the DBE program. The contractor sued the MTA, but subsequently dismissed its action. Cornelius then filed suit. (*Cornelius, supra*, 49 Cal.App.4th at p. 1765.) He claimed standing based on his status as an employee and/or agent for businesses that had bid and would bid in the future on MTA projects. (*Id.* at p. 1767.) It was undisputed, however, that Cornelius was not a licensed contractor, and he asserted no ownership interest in any business that was a licensed contractor; therefore he was not qualified to bid on construction projects. "Thus, Cornelius has been and remains incapable as a matter of law of submitting a bid to the MTA *as a general contractor.*" (*Id.* at pp. 1771–1772.) Cornelius's further argument, that as a civil engineer

" '[he] *may* bid on work for MTA contracts . . . and provide professional engineering services under contract with MTA general contractors,' " was also insufficient to satisfy standing requirements. (*Id.* at p. 1772.) "[T]he inchoate possibility based upon his possession of an engineer's license that Cornelius could have or may want to bid and, if so, the DBE criteria would deny him the ability to compete on equal footing, is insufficient to make the showing, as required by case law, of an imminent injury." (*Id.* at p. 1773.)

The case of *Associated Builders* provides additional guidance. There, petitioner trade association's members had refused to bid on certain airport construction contracts because they contained a specification called a "project stabilization agreement (PSA)." (*Associated Builders, supra*, 21 Cal.4th at pp. 358, 362.) The association (ABC) filed a petition for writ of mandate seeking an order to strike the PSA as violative of the state Constitution and statutes. The petition was denied on the merits. (*Id.* at p. 360.) On appeal the airports commission argued the ABC lacked standing because it had failed to show any history of past bids by its members, failed to show the members had the necessary qualifications to bid in the future, and failed to allege its members would bid on contracts of the requisite size (i.e., those exceeding $50,000). (*Id.* at p. 362.) The Supreme Court rejected these arguments, concluding, "[i]f . . . ABC could demonstrate that the PSA specification has the effect of infringing its members' rights of association or expression, *or that it has an anticompetitive impact on them*, then ABC might legitimately claim a beneficial interest within the meaning of Code of Civil Procedure section 1086 and cases interpreting that statute. Thus, although ABC's allegations on the issue of standing are rather scanty,[11] we conclude they suffice to confer standing to challenge the PSA on behalf of its members." (*Id.,* at p. 363, italics added, citing *Adarand, supra*, 515 U.S. at p. 211.)

C. *Analysis*

1. *Standing to Sue*

City concedes that Coral has demonstrated a potential future injury that is "concrete and particularized"—i.e., that Coral could be harmed in the future as a potential prime contractor by not receiving the benefit of a discount under the bid discount program, or by having its bid rejected for failure to

---

[11] "ABC predicates its allegation of standing on a declaration by . . . the Executive Director of the Golden Gate Chapter of [ABC], stating that seven named members of Associated Builders and AACA refused to bid on the airport project due to the PSA specification." (*Associated Builders, supra*, 21 Cal.4th at p. 362.)

comply with the subcontracting program. City argues, however, that Coral has not offered "any evidence that it was likely to bid as a prime contractor on a City contract to which the City's programs applied in the foreseeable future." Therefore, City argues, "Coral fail[s] the imminence test." In support of this contention City has marshaled the following evidence: Coral does not regularly bid on City contracts and has bid on only one prime contract subject to the Ordinance; City "only rarely" puts out to bid the type of specialized sign work Coral has done in the past; many of City's construction contracts are not subject to the Ordinance; and City has no current plans to put out to bid any contracts subject to the Ordinance that include specialized sign work Coral has done in the past, except for an airport project that is not expected to be funded, if at all, until 2007.

In essence, City tenders this novel theory: Once a defendant has presented proof that there are no "current plans" to put out to bid any contracts subject to the challenged Ordinance for the kind of work the plaintiff has done, the burden shifts to the plaintiff to identify a *specific* contract it will bid upon *in the near future* in order to demonstrate an injury that is "actual or imminent" and not "conjectural or hypothetical." We do not think this theory accurately reflects the law. City's contention is predicated primarily on the view that Coral "had to present evidence showing that (1) the City is 'likely' to let a prime contract for a specific service [overhead signage] in the *reasonably* near future; and (2) Coral is 'very likely' to bid on that contract. (*Adarand, supra*, 515 U.S. at p. 212; *Cornelius, supra*, 49 Cal.App.4th at p. 1769.)" (Italics added.) Following City's lead, the court below reached the conclusion that because Coral had submitted only one bid to City as a prime contractor, and because "the City only rarely puts out to bid the type of sign work Coral has on occasion sought to perform for the City, the Court cannot conclude that Coral could suffer harm as a potential prime contractor in the *reasonably* near future. [Citations.] [¶] Therefore, the Court cannot reasonably infer that at the time Coral filed its complaint, (1) Coral faced an imminent injury from the Bid Discount Program . . . or (2) at some time in the *reasonably* near future, the City would reject a bid by Coral on a prime contract for failing to comply with the Subcontracting Program." (Italics added.)

■ Contrary to City's contention, we are aware of no requirement that a plaintiff must prove the agency is likely to let a contract the plaintiff will bid on "in the *reasonably* near future" in order to establish "imminent" injury. In *Adarand* it happened that the plaintiff satisfied the standing requirement by demonstrating the state put certain contracts out to bid on a more-or-less

annual basis, this frequency was not likely to change, and the plaintiff regularly bid on those contracts. (*Adarand, supra,* 515 U.S. at p. 212.) However, the court in *Adarand* did not hold that something less than annual bidding would not satisfy the standing requirement. Rather, the question was whether "sometime in the *relatively* near future [plaintiff] will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors." (*Id.* at p. 211, italics added).) [12]

The term "relatively" is not synonymous with "reasonably." In this setting, a commonsense meaning of the term "relatively" would refer to bidding relative to the frequency of contracts becoming available for bidding. (See, e.g., *Bras, supra,* 59 F.3d at p. 873 ["[t]hat Bras can only compete for long-term contracts every several years rather than on a project-by-project basis does not change the analysis"].) City contends, however, that *Bras* was incorrectly decided and, instead, this court should follow more recent decisions on the subject of imminent injury. None of the four cited decisions are applicable here.

In *Thomas v. Anchorage Equal Rights Com'n* (9th Cir. 2000) 220 F.3d 1134 *(Thomas)* and *San Diego County Gun Rights v. Reno* (9th Cir. 1996) 98 F.3d 1121 *(San Diego)*, the plaintiffs challenged the constitutionality of certain proscriptive statutes. In such cases, a plaintiff has standing to sue only if he or she faces a " 'genuine threat of imminent prosecution' " under the challenged statute. (*Thomas, supra,* 220 F.3d at p. 1139; *San Diego, supra,* 98 F.3d at pp. 1126–1127.) The plaintiffs could not satisfy this standard because they alleged no concrete plan to violate the challenged statutes. In *San Diego* the plaintiffs alleged only that they " 'wish and intend to engage in activities prohibited by [the statute].' " (*San Diego, supra,* 98 F.3d at p. 1127.) In *Thomas* the plaintiffs' claimed injury was only a "fear of enforcement or prosecution" if they did violate the statute. (*Thomas, supra,* 220 F.3d at p. 1139.) Thus, none of the plaintiffs could demonstrate any real danger that they would suffer a direct injury as a result of the statute's operation or enforcement. (Compare *Babbitt v. Farm Workers* (1979) 442 U.S. 289, 302–303 [60 L.Ed.2d 895, 99 S.Ct. 2301] [the plaintiffs had standing because they alleged they previously engaged in and would continue to engage in acts regulated by the challenged statute].)

City also cites *Scott v. Pasadena Unified School Dist.* (9th Cir. 2002) 306 F.3d 646 *(Scott)*. But there, the plaintiffs filed suit prior to *any* application of a school district's allegedly unconstitutional school integration policy. (*Id.* at

---

[12] Nor does *Cornelius* hold that bidding must occur in the near future. In *Cornelius* the court articulated the rule in this way: "[I]n order for a party to show that the future use of the DBE criteria will cause an actual or imminent injury, the party must minimally show it has bid in the past and would continue to bid in the future." (*Cornelius, supra,* 49 Cal.App.4th at p. 1773.)

pp. 651–652.) Moreover, because the policy was only a conditional one, i.e., it would be applied if—and only if—the school population was found not to be sufficiently diverse without application of the policy (*id.* at p. 650), the plaintiffs could not show a " 'genuine threat' of adverse treatment due to the policy's imminent enforcement" (*id.* at p. 657).

In the fourth cited case, *Schurr v. Resorts Intern. Hotel, Inc.* (3d Cir. 1999) 196 F.3d 486, 490, 495 (*Schurr*), although the plaintiff alleged an incident of unlawful employment discrimination in 1994 pursuant to the defendant's affirmative action regulations, there was no evidence he was in danger of suffering imminent injury from application of the regulations in the future. Indeed, the evidence showed it was unlikely he would suffer any future harm because, since the 1994 incident, the regulations had not adversely affected his ability to secure both a full-time position and numerous, additional part-time positions. (*Id.* at p. 495.)[13]

City also relies on language found in *Lujan* and in *Los Angeles v. Lyons* (1983) 461 U.S. 95 [75 L.Ed.2d 675, 103 S.Ct. 1660] (*Lyons*) to support its claim that Coral has failed to prove an "imminent" injury. But the language is of little use here, in a fundamentally different factual setting.

In *Lyons*, the plaintiff was injured when a police officer used a chokehold "without provocation or justification." The plaintiff claimed this practice was the result of a city policy. (*Lyons, supra,* 461 U.S. at pp. 97–98.) The court held the plaintiff had no standing to seek prospective relief from that policy because the plaintiff did not allege any reasonable likelihood—but only a "fear"—that a future encounter with police officers would result in his being subjected to the chokehold again. (*Id.* at p. 107 & fn. 8.)

*Lujan* is even less useful as precedent. There, the Court explained that the quantum of proof to establish standing depends in large measure on whether the plaintiff is among those governed by the regulation at issue. "When the suit is one challenging the legality of governmental action . . . , the nature and extent of facts that must be averred . . . or proved . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action . . . at issue. If he is, there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it. When, however, as in this case, a plaintiff's asserted injury

---

[13] *Schurr* also does not address the inability to *compete* on equal footing for a contract. (*Northeastern Fla., supra,* 508 U.S. at p. 666, fn. omitted; and see *Coral Const., supra,* 941 F.2d at p. 930 ["an injury results not only when Coral Construction actually loses a bid, but every time the company simply places a bid"].) The affirmative action program in *Schurr*, unlike those in *Adarand, Bras, Northeastern Fla.*, etc., did not automatically give to minority or female applicants any extra points or discounts.

arises from the government's allegedly unlawful regulation . . . of *someone else*, much more is needed." (*Lujan, supra,* 504 U.S. at pp. 561–562.) In *Lujan* the challenged regulation did not apply to the plaintiffs and they claimed only that it might, indirectly, affect their activities at some indefinite future time. The court noted that, in a case where no actual injury is claimed, the " 'some day' intentions [of plaintiffs] without any description of concrete plans" (*id.* at p. 564) stretch the concept of imminence "beyond the breaking point" (*id.* at pp. 564–565, fn. 2.) "*In such circumstances* we have insisted that the injury proceed with a high degree of immediacy, *so as to reduce the possibility of deciding a case in which no injury would have occurred at all.* [Citations.]" (*Ibid.*, italics added.)

As can be seen, *Lyons* and *Lujan* have little bearing on this case. Here, Coral indisputably is an object of the challenged regulation, has suffered actual injury from its application, and has stated an unequivocal intention and ability to take action affected by the regulation, to its injury, in the future.

As further support for its contention that Coral cannot demonstrate imminent injury, City points to the additional facts that (a) Coral has bid on only one prime contract, and (b) many City contracts are not governed by the Ordinance. But the fact that some, or even many, of City's contracts—past and future—are not covered by the Ordinance does not negate the fact that some contracts were, and will be, governed by the Ordinance, or the fact that Coral has bid in the past and stands ready, willing and able to bid in the future on contracts governed by the Ordinance. The issue, simply put, is whether a plaintiff can show it will bid on a contract sometime in the relatively near future under an ordinance that "offers financial incentives . . . for hiring disadvantaged subcontractors." (*Adarand, supra,* 515 U.S. at p. 211.)

Similarly, the fact that Coral has, in the past, bid on only one prime contract is not proof that future injury is only conjectural.[14] In *Associated Builders* the plaintiff's members refused to bid on *any* contracts containing an allegedly illegal specification. (*Associated Builders, supra,* 21 Cal.4th at p. 362.) There, standing was challenged on the ground, among others, that the plaintiff had not shown a history of bidding nor proven its members would

---

[14] City also cites as a *separate* factor supporting the absence of imminent injury, Coral's "sporadic" bidding on prime contracts. To say Coral bid "only a single time" on a prime contract and Coral bid "sporadic[ally]" on prime contracts appears to us to be the same thing, merely stated differently. Moreover, there is no evidence in the record there were any prime contracts Coral could have bid on, but did not, other than the 2002 airport taxiway bypass project. There is evidence that in 1997, 1999 and 2000 DPW put out for bid three street and bridge improvement projects that *included* erection of overhead sign structures, but the record does not elucidate whether Coral was qualified to bid as a prime contractor (as opposed to a subcontractor) on these projects.

bid in the future on contracts containing the specification. (*Ibid.*) As we have noted, the high court rejected this contention, and held the plaintiff need only allege its members are potential bidders on whom the specification would have an anticompetitive impact, in order to show the necessary "beneficial interest." (*Id.* at p. 363.)

■ We are aware of no cases, and City has cited none, holding that the "imminent injury" component of standing, in a case challenging an allegedly illegal bidding ordinance, is negated if a plaintiff has bid only once in the past. Rather, the various formulations of the rule emphasize likelihood, ability and willingness of the plaintiff to bid *in the future*. While multiple past bids would certainly be relevant in determining the likelihood of future bids (see, e.g., *Adarand, supra*, 515 U.S. at p. 212; *Bras, supra*, 59 F.3d at pp. 873–874), they are not a sine qua non of standing.[15]

We would agree that standing cannot be conferred if it hinges upon a single never-to-be-repeated event. But these are not the facts of this case. Here it has been shown: (1) City occasionally puts out contracts for the specialized sign work done by Coral; (2) at least some of those contracts are covered by the Ordinance; (3) Coral has bid on at least one such contract as a prime contractor; (4) Coral suffered an actual injury as a result of the application of the Ordinance; (5) Coral stands ready, willing and able to bid on future contracts; and (6) under the Ordinance, when Coral does bid it will be "forced to compete on an unequal basis." These facts more than satisfy the standing test articulated in *Cornelius*: "From [the *Adarand, Bras* and *Northeastern Fla.*] cases we distill the principle that in order for a party to show that the future use of the DBE criteria will cause an actual or imminent injury, the party must minimally show it has bid in the past and would continue to bid in the future." (*Cornelius, supra*, 49 Cal.App.4th at p. 1773.)[16]

City seeks to avoid this result by arguing that a plaintiff such as Coral— with no *immediate* threat of future harm—can vindicate any past harm and litigate the issue of the Ordinance's legality by suing for damages, as did the plaintiffs in *Schurr* and *Lyons*. But it is not for City to select a plaintiff's remedies. Presumably, Coral could have pursued a claim for damages, but its failure to do so does not defeat its standing to seek prospective relief. As

---

[15] Although standing was not at issue in *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 543–544 [101 Cal.Rptr.2d 653, 12 P.3d 1068], it bears noting that the reported facts in that case involved a single disqualified bid by the plaintiff-contractor followed by the lawsuit seeking injunctive and declaratory relief.

[16] Having found that Coral is not precluded as a matter of law from challenging City's Ordinance as a past and future bidder on prime contracts, we need not separately determine whether Coral has standing as a past and future subcontractor.

stated in *Aetna Life Ins. Co. v. Haworth* (1937) 300 U.S. 227, 241 [81 L.Ed. 617, 57 S.Ct. 461] (*Aetna Life*), "[w]here there is . . . a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages."

The essence of the standing inquiry, as City itself concedes, is whether a dispute has matured to the point that it is proper for resolution by the judicial branch, i.e., whether "the issues presented are 'definite and concrete, not hypothetical or abstract.' [Citation.] In assuring that this jurisdictional prerequisite is satisfied, we consider whether the plaintiffs face 'a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement,' [citation,] or whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction." (*Thomas, supra*, 220 F.3d at p. 1139.)

■ We do not hear City to say the issues presented by this action are not sufficiently definite or concrete, as opposed to hypothetical or abstract. Nor do we hear City to say there is no realistic danger of Coral sustaining any direct injury as a result of the Ordinance's operation—indeed, City concedes such injury has already occurred. What we do hear City to say is that, because Coral cannot prove it will bid on a *specific* contract *in the near future* that will cause such harm, the alleged injury is too imaginary or speculative to support standing. If this were an accurate statement of the law, then those who bid on contracts that are let frequently would have standing to challenge a bidding ordinance but those who bid on contracts that are let only sporadically or infrequently would not—even if they can prove (a) an actual injury from past bidding and (b) the intention and ability to continue bidding. But standing does not turn upon the happenstance of contract frequency. Accordingly, the trial court erred in concluding that Coral did not face an " 'invasion of a legally protected interest' from the Ordinance that is both (a) 'concrete and particularized[,'] and (b) 'actual or imminent.' "

### 2. *Ripeness*

City urges us to affirm the judgment on the alternative grounds that the matter is not ripe for adjudication. We conclude the controversy is sufficiently concrete and definite for a judicial determination.

"The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. . . . [T]he

ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306] (*Pacific Legal*).)

In *Pacific Legal*, the plaintiffs challenged the validity of public access guidelines adopted by the Coastal Commission. The suit did not attack a particular permit condition, nor was it predicated upon any specific application of the guidelines. (*Pacific Legal, supra*, 33 Cal.3d at pp. 168–169.) Although the plaintiffs made reference to other cases in which the guidelines had been applied and public access exacted from landowners, they described their own lawsuit as a "general challenge on statutory and constitutional grounds to the Commission's access policies." (*Id.* at p. 169.) The high court concluded the controversy was not ripe. "Plaintiffs are in essence inviting us to speculate as to the type of developments for which access conditions might be imposed, and then to express an opinion on the validity and proper scope of such hypothetical exactions. We decline to enter into such a contrived inquiry." (*Id.* at p. 172.)

 City's ripeness argument echoes its challenge to Coral's standing:[17] "Because Coral [cannot] point to a single contract subject to the Bid Discount or Subcontracting Programs on which Coral intends to bid, at this time its challenge is 100 percent abstract." But we have already concluded that Coral is not required to identify a contract on which it intends to bid in the near future to demonstrate standing. Further, it is undisputed that Coral's challenge to the Ordinance is not merely a general, abstract challenge to regulations and policies such as that brought by the plaintiffs in *Pacific Legal, supra*, 33 Cal.3d 158, but relies also on allegations of a specific application of the Ordinance to a bid submitted by Coral, to its injury. This is sufficient to present a "definite and concrete [controversy] touching the legal relations of parties having adverse legal interests." (*Aetna Life, supra*, 300 U.S. at pp. 240–241.) The ripeness requirement is satisfied.

### 3. *Statute of Limitations*

Finally, City argues the judgment should be upheld on the alternative ground that Coral's action is barred by the statute of limitations. City reasons as follows: Coral filed an action for damages resulting from its disqualified bid; the action also requests a writ of mandate, declaratory relief and

---

[17] We observe, in this connection, that there is considerable debate as to whether ripeness and standing principles are indistinguishable, or at least, largely congruent. (See *Thomas, supra*, 220 F.3d at pp. 1138–1139 and articles cited therein.)

injunctive relief, seeking invalidation of the Ordinance. The damage claim was eliminated by way of demurrer, so the remaining causes of action constitute *only* a facial challenge to the Ordinance. A facial challenge to an ordinance accrues when the ordinance is adopted. The statute of limitations for asserting an infringement of constitutional rights is one year. Coral's facial challenge to the Ordinance was not filed within one year of its adoption and is, therefore, barred.

█ We do not agree that Coral's mandamus and equitable causes of action constitute a purely facial challenge. At best Coral's claims are hybrids, challenging the Ordinance both facially and as it was applied to Coral's bids. In fact, in a different context City itself describes the action as an "as-applied challenge." And, City does not dispute that chapter 12D.A. of the Ordinance remains in full force and effect and will continue to be enforced with respect to all bids to which it applies. Paraphrasing the holding of *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 821–822 [107 Cal.Rptr.2d 369, 23 P.3d 601], we conclude: "In short, [plaintiff has] alleged an ongoing violation of Proposition [209's] commands, for which [it] seek[s] relief in mandamus (Code Civ. Proc., § 1085, subd. (a)), and a presently existing actual controversy between [itself] and the City over the validity of the [Ordinance], which [plaintiff] seek[s] to resolve by declaratory judgment (Code Civ. Proc., § 1060); those causes of action are not barred merely because similar claims could have been made at earlier times . . . or because [plaintiff does] not at this time also seek [damages]."

### 4. *Constitutionality of the Ordinance and of Proposition 209*

Both parties ask us to address the merits of the controversy. Coral argues that because City admitted in the trial court that the constitutionality of the Ordinance is a legal issue, that question can be decided in the first instance on this appeal. City responds that the constitutionality of the Ordinance cannot be decided as a matter of law because it involves the factual issue of whether the Ordinance falls within Proposition 209's meeting federal requirements exception. City also urges us, however, to affirm the judgment in its favor on the basis that the application of Proposition 209 to this Ordinance would be unconstitutional because it would "prevent [City] from enacting remedial legislation to assist minorities and women." Our review of the record makes clear that these issues cannot be decided in the first instance on appeal. Accordingly, we decline the invitations to decide the merits.

## IV. DISPOSITION

The judgment is reversed and the cause is remanded for further proceedings.

Reardon, Acting P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied March 19, 2004.